IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| v. | )   Criminal No. 3:20cr0066 |
| | ) |
| MITCHELL WASHINGTON, | ) |
| | ) |
| Defendant. | ) |

## MOTION FOR COMPASSIONATE RELEASE UNDER 18 U.S.C. § 3582(c)(1)(A)(i)

Defendant Mitchell Washington, by counsel, moves this Court to grant his motion for compassionate release under 18 U.S.C. § 3182(c)(1)(A) for extraordinary and compelling reasons. Mr. Washington presents two extraordinary and compelling reasons for his compassionate release to be granted: (1) if sentenced today, Mr. Washington would not be a career offender. Based on the Fourth Circuit opinion in *McCoy,* the 72-month disparity between his current sentence and his advisory guideline range, if he were sentenced today, is an "extraordinary and compelling reason" for his compassionate release. *U.S. v. McCoy*, 981 F.3d 271 (4th Cir. 2021); and (2) the spread of the COVID-19 Virus at FCI Hazelton combined with his pre-existing medical conditions puts him at a high risk of severe illness or death if he contracts the virus.

### BACKGROUND

On March 19, 2020, Mr. Washington was arrested on a criminal complaint alleging that he distributed a Mixture and Substance Containing a Detectable Amount of Heroin and Fentanyl. On June 17, 2020, a Grand Jury returned an indictment charging Mr. Washington with two counts of Distribution of Heroin and Fentanyl, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C). (PSR ¶ 3). Count One involved .219 grams of heroin and fentanyl and Count Two involved 1.22 grams of heroin and fentanyl. (PSR at 4). On June 2, 2020, Mr. Washington pled guilty to both counts

1

of the indictment. Mr. Washington was found to be a career offender, with an advisory guideline range of 151-188 months; however, this Court granted a downward variance and imposed a sentence of 96 months, followed by five years of supervised release. (ECF 27). Mr. Washington has been incarcerated since March 19, 2020, and has a project release date of March 1, 2028.

The probation officer determined that a Chapter Four Enhancement pursuant to U.S.S.G. § 4B1.1(a) applied because Mr. Washington had two prior felony convictions of either a crime of violence or a controlled substance offense. The two predicates were a Virginia Robbery (Docket No.: CR99003615-00) and Possession with Intent to Manufacture, Sell Schedule I, II Drugs (Docket No.: CR14001048-00) (PSR. ¶¶ 40, 48).

Mr. Washington has served approximately thirty (30) percent of his 96-month sentence. During his time in prison, he has been productive and focused on rehabilitation. Further, he has maintained contact with his friends and family. He has support in the community and a solid release plan.

Mr. Washington filed a request for reduced sentence with the Warden on March 18, 2021. The Warden responded to Mr. Washington's request with a denial on April 16, 2021. (Exhibit 1).

## ARGUMENT

Following amendments made by § 603 of the First Step Act of 2018, Pub. L. 115-391, § 603, 132 Stat. 5194, 5239 (2018), defendants may now move for early release from prison for "extraordinary and compelling reasons" under 18 U.S.C. § 3582(c)(1)(A)(i) determining three things: *first*, whether a defendant has satisfied § 3582(c)(1)(A)'s non jurisdictional exhaustion provision; *second*, whether a defendant has demonstrated "extraordinary and compelling reasons," and *third*, whether the defendant's release is consistent with the § 3553(a) factors. Each of these is met here.

**I.     Mr. Washington has exhausted his administrative remedies**

Mr. Washington requested compassionate release from the warden at FCI Hazelton on March 18, 2021. The warden denied his request on April 16, 2021. (Exhibit 1). Accordingly, under well-established precedent, Mr. Washington has satisfied the exhaustion prerequisite of § 3582(c)(1)(A). *United States v. Muhammad*, 16 F.4th 126 (4th Cir. 2021).

**II.    This Court has the authority to reduce Mr. Washington's sentence and there are "extraordinary and compelling" reasons for a reduction.**

Section 3582(c)(2) of Title 18 of the United States Code provides that a court may modify a defendant's term of imprisonment "in the case of a defendant who has been sentenced to a term of imprisonment based on a sentencing range that has subsequently been lowered by the Sentencing Commission." 18 U.S.C. § 3582(c)(2). In *McCoy*, the Fourth Circuit stated that district courts may treat the length of a defendant's sentence, and the fact that the sentence would be dramatically shorter today "given the First Step Act's elimination of sentence-stacking under § 924(c)," as an "extraordinary and compelling reason" for compassionate release. *United States v. McCoy*, 981 F.3d 271, 285 (4th Cir. 2020). In so holding, the Fourth Circuit joined other courts in concluding that "the severity of a § 924(c) sentence, combined with the enormous disparity between that sentence and the sentence a defendant would receive today, can constitute an 'extraordinary and compelling' reason for relief under § 3582(c)(1)(A)." *Id.* Following *McCoy*, other courts in this Circuit have found that they "may consider changes in sentencing law—even nonretroactive ones—in assessing whether a defendant has shown extraordinary and compelling reasons warrant a reduction in his sentence." *United States v. Stuart*, 2020 U.S. Dist. LEXIS 231413, at *3 (E.D.N.C. Dec. 8, 2020); *United States v. Brown*, 2021 U.S. Dist. LEXIS 110273, at *24-26 (W.D. Va. June 11, 2021)(granting compassionate release to career offender based upon *Norman*).

3

**A. Mr. Washington's Conviction of Robbery and Possession with Intent to Distribute are no longer predicate offenses for the Career Offender enhancement under U.S.S.G. § 4B1.1(a).**

Mr. Washington was determined to be a Career Offender under U.S.S.G. § 4B1.1. This determination increased his base offense from a level 12 to a level 32. The Probation Officer's final calculations put Mr. Washington at an Offense Level of 29 and Criminal History Category VI. Given these calculations his sentencing guideline range was 151 – 188 months. The predicate offenses that led to Mr. Washington's Career Offender Status were Robbery (Docket No.: CR99003615-00) and Possession with Intent to Manufacture, Sell Schedule I, II Drugs (Docket No.: CR14001048-00) (PSR. ¶¶ 40, 48). Without the career offender determination his adjusted base offense level would have been 10, with a guideline range of 24 to 30 months.

1. **Virginia Robbery is no longer a Predicate Offense for Career Offender**

The Fourth Circuit recently held that Virginia Robbery can be committed without proving as an element the "use, attempted use, or threatened use of physical force," and therefore, does not qualify as a predicate offense for ACCA. *United States v. White*, 24 F.4th 378, 381 (4th Cir. 2022). The analysis to determine if a predicate offense is a "crime of violence" for career offender purposes under U.S.S.G. § 4B1.1 is the same analysis that applies to the "violent felony" definition under the Armed Career Criminal Act. (ACCA). *Crump v. United States*, 2019 U.S. Dist. LEXIS 52986, at *15 n.3 (S.D. W. Va. Mar. 6, 2019). Therefore, if sentenced today, Mr. Washington would no longer be considered a career offender.

2. **Possession with Intent to Distribute is no longer a Predicate Offense for Career Offender**

In *United States v. Campbell*, 22 F.4th 438 (4th Cir. 2022), the defendant was sentenced as a career offender in part because of a West Virginia conviction for delivery of crack cocaine that the district court held was a "controlled substance offense" under U.S.S.G. § 4B1.2. *Id*. at 440-41.

4

On appeal he argued that 1) § 4B1.2 does not include attempt offenses, and the commentary adding them was invalid; and 2) the West Virginia statute included attempts and was therefore overbroad compared to the § 4B1.2 definition. The Fourth Circuit agreed on both points.

It held that the comment to § 4B1.2 which adds attempts and conspiracy was invalid under *Stinson v. United States*, 508 U.S. 36, 38 (1993) because they were inconsistent with the text of § 4B1.2. They were inconsistent because the text of the guideline includes only completed offenses, and the addition of whole classes of inchoate offenses conflicted with the limited language of the guideline itself; commentary cannot "add to the Sentencing Guidelines' scope." *Id*. at 446 (brackets, citations omitted). The Fourth Circuit concluded that "the plain text of U.S.S.G. § 4B1.2(b) is inconsistent with the Commission's Commentary to that Guideline, and this is the only "reasonable construction of" U.S.S.G. § 4B1.2(b)." *Id*. at 447.

It also examined the West Virginia statute and held that it included attempted, as well as completed, deliveries.

> The West Virginia conviction that served as one of the predicate offenses justifying Campbell's enhanced sentence arises from a statute that makes it "unlawful for any person to manufacture, *deliver*, or possess with intent to manufacture or deliver a controlled substance."

*Id*. at 441-42 (quoting W. Va. Code § 60A-4-401(a) (emphasis added)). But another definitional statute clarified that "deliver . . . means the actual, constructive *or attempted* transfer from one person to another of" controlled substances or imitation or counterfeit controlled substances. (emphasis added)." *Id*. (emphasis in opinion) (quoting W. Va. Code § 60A-1-101(h)). *Id*. at 442. Therefore, based on the clear text of the statutes, the Court concluded that "the least culpable conduct criminalized by the West Virginia statute is an attempt to deliver a controlled substance." *Id*. at 442. Thus it was overbroad compared to the text § 4B1.2, which does not include attempts.

Virginia's statute employs the exact same language, and therefore the same result should follow.

> Virginia Code § 18.2-248(A) provides:
> [I]t shall be unlawful for any person to manufacture, sell, give, distribute, or possess with intent to manufacture, sell, give or **distribute** a controlled substance or an imitation controlled substance.

Va. Code § 18.2-248(A) (emphasis added). "Distribute" is further defined in the Drug Control Act as follows:

> "**Distribute**" means to **deliver** other than by administering or dispensing a controlled substance.

Va. Code § 54.1-3401 (emphasis added). And lastly, "deliver" is defined in the same statute, in relevant part:

> "**Deliver**" or "**delivery**" means the actual, constructive, **or attempted transfer** of any item regulated by this chapter, whether or not there exists an agency relationship[.]

Va Code § 54.1-3401 (emphasis added). Therefore, the Virginia offense of distributing a controlled substance includes acts constituting the "attempted transfer" of a controlled substance.

This reasoning has been confirmed by the Virginia Supreme Court:

> In Virginia, "**distribute**," as proscribed in Code §§ 18.2-248 and -248.1, means "to **deliver** other than by administering or dispensing a controlled substance." Code § 54.1–3401. "**Deliver**" means "the actual, constructive, **or attempted transfer**" of any controlled substance, "whether or not there exists an agency relationship," from one person to another. *Id.; Wood v. Commonwealth,* 214 Va. 97, 99, 197 S.E.2d 200, 202, *appeal dismissed,* 414 U.S. 1035, 94 S.Ct. 533, 38 L.Ed.2d 326 (1973).

*Moreno v. Baskerville*, 249 Va. 16, 18-19 (1995).

Thus, Virginia's drug trafficking statute has the same scope and definition that made West Virginia's drug trafficking statute ineligible to form a Career Offender predicate under U.S.S.G. § 4B1.2. Compare:

| West Virginia (§§ 60A-4-401(a), 60A-1-101(h)) | Virginia (§§ 18.2-248(a), 54-1-3400) |
|---|---|
| (a) Except as authorized by this act, it is unlawful for any person to manufacture, **deliver**, or possess with intent to manufacture or deliver a controlled substance.<br><br>(h) "Deliver" or "delivery" means the actual, constructive **or attempted transfer** from one person to another of: (1) A controlled substance, whether or not there is an agency relationship; (2) a counterfeit substance; or (3) an imitation controlled substance. | A. Except as authorized in the Drug Control Act (§ 54.1-3400 et seq.), it shall be unlawful for any person to manufacture, sell, give, **distribute**, or possess with intent to manufacture, sell, give or distribute a controlled substance or an imitation controlled substance<br><br>"**Distribute**" means to **deliver** other than by administering or dispensing a controlled substance.<br><br>"Deliver" or "delivery" means the actual, constructive, **or attempted transfer** of any item regulated by this chapter, whether or not there exists an agency relationship |

As this side-by-side shows, there is no material distinction between the West Virginia statutes at issue in *Campbell*, and the Virginia statutes at issue here. Neither statute qualifies as a "controlled substance offense" under U.S.S.G. § 4B1.2.

The government may argue that the statute is in some way divisible, such that the modified categorical approach applies and allows the Court to consider certain judicially noticeable documents. *See Mathis v. United States*, 579 U.S. 500, 505 (2016). That is, the categorical approach compares only elements; the modified categorical approach is only applicable to statutes that set out "several different crimes, not several different methods of committing one offense." *Id*. at 515 (citations omitted). Where a statute sets out alternative *crimes*, the Court may consult certain records to determine "what crime, with what elements, a defendant was convicted of." *Id*. at 505-06. But where the statute sets out only alternative *means* of committing a single offense, it is indivisible and the modified categorical approach does not apply, and the Court has "no call to decide which of the statutory alternatives was at issue in the earlier prosecution." *Id*. at 517; *see also United States v. Hope*, 28 F.4th 487, 496 (4th Cir. 2022) (outlining the categorical approach).

7

Here, the Virginia statute is not divisible between the various listed acts. The Virginia Supreme Court has held, to the contrary, that § 18.2-248(a) creates a "single crime" that can be committed through the several listed means of manufacturing, distributing, etc.

> §18.2-248(a), in our view, creates only a single offense, that being the unlawful manufacture, sale, transfer or distribution, or possession with the intent to manufacture, sell, give, distribute or possess certain controlled drugs.

*Stillwell v. Commonwealth*, 219 Va. 214 (1978). Therefore because this section creates a "single offense," the modified categorical approach is unavailable, and the inquiry ends.

Last, even if the Court were to apply the modified categorical approach, the available documents do not disclose what version of "distribution" was the basis for Mr. Washington's conviction. Here. the bare word "distribution" in the indictment, judgment, sentencing order or other document does not, under Virginia law, differentiate between completed transfers and attempted transfers. *See* Va. Code § 54-1-3400. Therefore Mr. Washington's prior conviction under Va. Code § 18.2-248 does not qualify as "controlled substance offense" under § 4B1.2, and if he was sentenced today he would not be a career offender, and he is eligible for compassionate release.

Numerous courts have found that a sentencing disparity based upon intervening changes in the applicability of the career offender enhancement can justify a sentence reduction under § 3582(c)(1)(A). *See, e.g.*, *United States v. Banks*, No. 3:13-cr-3, 2022 WL 220638 (W.D. Va. Jan. 25, 2022) (granting § 3582(c)(1)(A) compassionate release to defendant who would not be career offender today and Guidelines would be advisory); *United States v. Trice*, No. 7:13-cr-34, 2021 WL 402462, at *3 (W.D. Va. Feb. 3, 2021) (granting compassionate release to defendant who would not be career offender today). In granting § 3582(c)(1)(A) relief, the district court in *United States v. Williams* observed that "defendants who . . . no longer qualify as 'career offenders' may

8


suffer from the kind of sentencing disparity that the compassionate release statute was intended to capture." No. 14-cr-428-TSE, 2021 WL 5827327, at *5-7 (E.D. Va. Dec. 8, 2021).

With the exclusion of Virginia Robbery and the Possession with Intent to Distribute predicate offenses, Mr. Washington's would not have been designated as a career offender and his total offense level would have been 10 and his guideline range would have been 24 – 30 months. (PSR. ¶¶ 15, 95). He has already served 28 months of his current sentence and the disparity in his sentence can easily be cured by adjustment of his sentence to what his guideline range would be today and granting him release based on time served. This disparity in his sentencing guideline is an "extraordinary and compelling" for the court to impose a reduced sentence under 18 U.S.C. § 3582(c)(1)(A)(i).

**B. Mr. Washington's pre-existing medical conditions and the COVID-19 pandemic, in combination, constitute extraordinary and compelling reasons to release him.**

In addition to the Fourth Circuit's holding that "district courts are empowered to consider any extraordinary and compelling reason for release that a defendant might raise." *United States v. McCoy*, 981 F.3d 271, 284 (4th Cir. 2020) (internal quotation marks and citations omitted), it has also recognized that the non-binding policy guidance found in U.S.S.G. § 1B1.13 is helpful in assessing a defendant-filed motion for compassionate release. *See Id*. at 278-84. The Sentencing Commission's current policy statement sets forth a non-exhaustive list of factual considerations for determining whether a modified sentence is appropriate: (1) the medical condition of the defendant (including both terminal illness and other serious conditions and impairments); (2) the age of the defendant (for those 65 and older who have completed at least 10 years or 75-percent of the term of imprisonment); (3) the family circumstances of the defendant; and (4) "other reasons" as determined by the BOP. U.S. Sent'g Guidelines Manual § 1B1.13 cmt. n.1(A). "Extraordinary and compelling reasons exist under any of the [factors]," such that each factor is an independent

basis for release. *Id.* at n.1. Importantly, as the commentary explains, the extraordinary and compelling reasons "need not have been unforeseen at the time of sentencing in order to warrant a reduction in the term of imprisonment." *Id.* at n.2. Thus, even if a factor was known or anticipated by the sentencing court, such as a then-existing health condition, a defendant is not precluded from consideration for a sentence reduction. *Id.*

### 1. Mr. Washington's Medical Conditions

Mr. Washington suffers from multiple conditions on the CDC's list that make him medically vulnerable.[1] Mr. Washington suffers from prediabetes and hypertension (or high blood pressure) and therefore has a "high-risk" of severe illness or death if exposed to COVID-19. *See* Def's Pro Se Mot. at 22; Exhibit 2 (defendants medical records).

After months of protracted litigation of these issues in the district courts, the Department of Justice's ("DOJ") current position – as represented by the Government in compassionate release proceedings nationwide – is that an inmate at heightened risk of severe COVID-19 illness due to underlying medical conditions satisfies U.S.S.G. § 1B1.13, cmt. n.1(A)(ii). *See, e.g.*, Government's Unopposed Motion for Remand, *United States v. Garcia*, 7th Cir. No. 20-1716, Dkt. No. 9 at 7-8 (conceding on appeal that inmate with diabetes, a risk factor for severe COVID-19 illness, "presented an 'extraordinary and compelling' reason for his release within the framework of section 3582(c)[(1)(A)] and [U.S.S.G. § 1B1.13, cmt. n.1(A)(ii)]."). That is, such an inmate meets Note 1(A)(ii)'s criteria, "even if that condition in ordinary times would not allow for compassionate release." *Id*. (quoting U.S.S.G. § 1B1.13, cmt. n.1(A)(ii)). *See also* Letter Amending Government's Response, *United States v. Wise*, 1:18-CR-00072, Dkt. No. 185 (D. Md.

---

[1] Centers for Disease Control ("CDC"), Coronavirus Disease 2019 (COVID-19): People Who Are At Higher Risk. Available online at: https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people -at-higher-risk.htm

10

May 18, 2020) (conceding 'extraordinary and compelling circumstances' under § 1B1.13 cmt. n.1(A)(ii) for at-risk inmate on the basis of DOJ guidance); Supplemental Response, *United States v. Wright*, 8:17-CR-00388, Dkt. No. 50 (D. Md. May 19, 2020) (same).

### A. Hypertension

Hypertension, also called High blood pressure, is blood pressure that is higher than normal. The higher the blood pressure levels, the greater the risk for other health problems, such as heart disease, heart attack, and stroke.[2] Cedars-Sinai Medical Center researchers studied 912 people in Los Angeles who tested positive for COVID after receiving at least three mRNA COVID-19 vaccine doses from Dec 1, 2021, to Apr 20, 2022. A total of 145 (15.9%) were hospitalized, 125 (86.2%) of whom had high blood pressure (hypertension).  "Our results indicate persistence and even accentuation of hypertension-related risk in the setting of a more transmissible albeit generally less virulent strain," the researchers wrote. "Although the mechanism for hypertension-associated COVID-19 risk remains unclear, prior studies have identified delayed SARS-CoV-2 viral clearance and prolonged inflammatory response among hypertensive patients."  In other words, even vaccinated individuals who suffer from hypertension are at risk for severe illness, hospitalization, and bad outcomes if they contract COVID.[3]

---

[2] "High Blood Pressure Symptoms and Causes." Centers for Disease Control and Prevention, Centers for Disease Control and Prevention, 19 May 2020, www.cdc.gov/bloodpressure/about.htm (last visited July 28, 2020)

[3] Joseph Ebinger, Matthew Driver, Sandy Joung,Teresa Tran,Denisse Barajas,Min Wu,Patrick Botting, Jesse Navarrette, Nancy Sun and Susan Cheng, "Hypertension and Excess Risk for Severe COVID-19 Illness Despite Booster Vaccination," Hypertension (20 Jul 2022). Available at:https://www.ahajournals.org/doi/abs/10.1161/HYPERTENSIONAHA.122.19694

11

| BLOOD PRESSURE CATEGORY | SYSTOLIC mm Hg (upper number) | and/or | DIASTOLIC mm Hg (lower number) |
|---|---|---|---|
| NORMAL | LESS THAN 120 | and | LESS THAN 80 |
| ELEVATED | 120 – 129 | and | LESS THAN 80 |
| HIGH BLOOD PRESSURE (HYPERTENSION) STAGE 1 | 130 – 139 | or | 80 – 89 |
| HIGH BLOOD PRESSURE (HYPERTENSION) STAGE 2 | 140 OR HIGHER | or | 90 OR HIGHER |
| HYPERTENSIVE CRISIS (consult your doctor immediately) | HIGHER THAN 180 | and/or | HIGHER THAN 120 |

The American Heart Association published the chart above to help individuals understand their blood pressure.[4] Mr. Washington's most recent blood pressure readings are as follows: 08/23/2021 - 145/88; 09/22/2021 - 117/77; 09/28/2021 - 117/82 ; 10/05/2021 - 149/94; 10/22/2021 - 128/83 ; 05/09/2022 - 129/77;06/09/2022 - 135/85. (Exhibit 2 ). These readings reflect that even though he is taking medication his blood pressure remain in the elevated to high blood pressure range. Mr. Washington's hypertension requires him to take medication daily and he is required to take many other measures to prevent worsening his other medical conditions. For example, Mr. Washington is required to sleep on a lower bunk, has been given a compression stocking to help with his drop foot and he is prescribed more medication for his Hyperlipidemia. *Id.*

---

[4] Available at: https://www.heart.org/en/health-topics/high-blood-pressure/understanding-blood-pressure-readings

Courts have granted compassionate release to inmates with hypertension, diabetes,[5] or a combination of these conditions, *see United States v. Salvagno*, No. 5:02-CR-51, 2020 WL 3410601 at *12 (N.D.N.Y. Jun. 22, 2020), *reconsideration denied*, No. 5:02-CR-51, Dkt. No. 1181, June 22, 2020) (granting and subsequently affirming compassionate release to inmate with high blood pressure); *See, e.g., United States v. Readus*, No. 16-20827-1, 2020 WL 2572280, at *3 (E.D. Mich. May 21, 2020) (granting compassionate release to 33-year-old inmate whose conditions included hypertension and prediabetes) (citing similar pretrial release cases).

**B. Prediabetes**

People with diabetes are more likely to have serious complications from COVID-19. In general, people with diabetes are more likely to have more severe symptoms and complications when infected with any virus. Having heart disease or other complications in addition to diabetes could worsen the chance of getting seriously ill from COVID-19, like other viral infections, because more than one condition makes it harder for your body to fight the infection. Viral infections can also increase inflammation, or internal swelling, in people with diabetes. This can also be caused by above-target blood sugars, and that inflammation could contribute to more severe complications.[6]

Mr. Washington's Hemogloin A1C is at 5.8 (4.0 – 5.7) which puts him in the range for Prediabetes. (Exhibit 2). This however, does not change the impact of COVID on his risk of serious illness or death. As aptly explained in *Rodriguez*,

> Early research shows that diabetes/pre-diabetes patients . . . have mortality rates that are more than twice as high as overall mortality rates. One recent report revealed: "Among

---

[5] *See also United States v. Rupert*, No. 4:10-cr-4009 (C.D. Ill. May 21, 2020) (granting compassionate release to 42-year-old defendant with "either diabetes or prediabetes").
[6] "How COVID-19 Impacts People with Diabetes" Centers for Disease Control and Prevention, Centers for Disease Control and Prevention, https://www.diabetes.org/coronavirus-covid-19/how-coronavirus-impacts-people-with-diabetes (last visited July 28, 2022)

13

> 784 patients with diabetes, half were hospitalized, including 148 (18.8%) in intensive care. That compares with 2.2% of those with no underlying conditions needing ICU treatment." These statistics—which focus on the non-prison population—become even more concerning when considered in the prison context. Prisons are tinderboxes for infectious disease. The question whether the government can protect inmates from COVID-19 is being answered every day, as outbreaks appear in new facilities.

20201627331, at *1 (E.D. Pa. Apr. 1, 2020)

COVID severely affects both people with prediabetes and diabetes and either are serious medical conditions that should be considered as an extraordinary and compelling reason to grant relief. *See United States v. Rupert*, No. 4:10-cr-4009 (C.D. Ill. May 21, 2020).

### C. Mr. Washington's risk of exposure to COVID-19 at FCI Hazelton is substantial.

For over 2 years, COVID-19 has torn through BOP facilities. At least 247 federal inmates have died from COVID-19. FCI Hazelton has reported two deaths for the institution. A study calculated that within BOP the COVID-19 case rates and the standard death rate ratio were approximately 5 and 2.5 times higher than those death rates for the U.S. adult population respectively. As of the date of this filing, there are 520 inmates and 470 staff with active cases of COVID-19 in BOP, specifically with 2 inmate deaths at FCI Hazelton.[7] FCI Hazelton is currently at Level 2 with visitation suspended[8]. This means that there is limited capacity to social distance at this facility[9].

This Court is well within its discretion to grant Mr. Washington compassionate release based on his medical conditions as an extraordinary and compelling reason. His risk of severe illness or death if he were to be infected with COVID-19 are too high, particularly considering the current outbreak at FCI Hazelton combined with his diagnoses of hypertension and prediabetes.

---

[7] BOP, *COVID-19 Cases*, https://www.bop.gov/coronavirus/ (last visited July 28, 2022).
[8] BOP, FCI Hazelton, https://www.bop.gov/locations/institutions/haf/ (last visited July 28, 2022).
[9] BOP, BOP COVID-19 Operational Levels, https://www.bop.gov/coronavirus/covid19_modified_operations_guide.jsp (last visited July 28, 2022).

14

**III.     This Court is within its discretion to grant Mr. Washington's release where it is consistent with the 18 U.S.C. § 3553(a) factors, his further incarceration is unnecessary to protect the public, and this Court may impose whatever conditions of release it deems necessary.**

Where there are "extraordinary and compelling reasons," § 3582(c)(1)(A)(i), and if consistent with the Commission's policy statements, a "court . . . may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable." § 3582(c)(1)(A).

**A.     "Sufficient but not greater than necessary" and § 3553(a)(2)(A).**

In the age of COVID-19, "sufficient but not greater than necessary" takes on new meaning, and particular significance, for vulnerable at-risk inmates. That is, "[t]o avoid a sentence that *was* sufficient but no greater than necessary from becoming one immeasurably greater than necessary," the compassionate release of vulnerable, low security inmates like Mr. Jones is appropriate. *United States v. Park*, 2020 WL 1970603 at *5 (S.D.N.Y. Apr. 24, 2020) (emphasis added) (internal citation omitted). *Accord United States v. Mel*, 2020 WL 2041674 at *3 (D.Md. Apr. 28, 2020) (finding release appropriate where "the actual severity of the sentence as a result of the COVID-19 outbreak exceeds what the Court anticipated at the time of sentencing."); *United States v. Amarrah*, 2020 WL 2220008 at *6 (E.D. Mich. May 7, 2020) ("The Court sentenced Defendant to 60 months in prison; it did not sentence him to death or to incarceration that carries a significant risk of death."); *United States v. Valencia*, 2020 WL 2319323 (S.D.N.Y May 11, 2020) ("The Court did not intend that Valencia's sentence 'include incurring a great and unforeseen risk of severe illness or death' brought on by a global pandemic." (quoting *United States v. Rodriguez*, 2020 WL 1627331, at *12 (E.D. Pa. Apr. 1, 2020)).

15

As to the sufficiency of the time Mr. Washington has served to date, he has now served approximately thirty (30) percent of his term; 28 months of actual time and more time than his guidelines would have been if he was sentenced today. In determining whether his time served to date is "sufficient, but not greater than necessary," this Court can consider the fact that that his current sentence is *far* in excess of what Mr. Washington would receive for the same conduct today.

Mr. Washington respectfully submits that considering all the present circumstances, his time served to date has been sufficient, and this Court is authorized to ensure it does not become "greater than necessary." Mr. Washington has almost served 28 months and that adequately reflects the seriousness of his offense and has provided just punishment for same, considering the COVID-19 pandemic and his at-risk status.

B. **Deterrence and protection of the public, § 3553(a)(2)(B)-(C).**

Mr. Washington also respectfully submits that the objectives of deterrence and protection are satisfied by the time he has served, § 3553(a)(2)(B)-(C), and that supervised release and/or home confinement would be adequate to assuage any concerns, for the following reasons.

Mr. Washington has put significant efforts toward rehabilitation and bettering himself in the time he has already served in the BOP. He has participated in Drug Educations and numerous education courses meant to improve his current knowledge base and prepare him for re-entry into society after his incarceration. While at FCI Hazelton, Mr. Washington has taken courses about information technology and is currently enrolled in a GED course. (Exhibit 3 pg. 1). Mr. Washington's past convictions all revolve around his substance abuse disorder. While in prison, he has taken time to enter drug education programs to help overcome this.

On release from custody, Mr. Washington will be going back to a supportive environment. He will return to live with his wife, who he has kept contact with and spoken frequently with during his incarceration and will be supported by his mother and sister who are employed at a daycare and have no criminal record. (Exhibit 3 pg. 2); (PSR. ¶¶ 68, 70). He has a viable release plan if released back into the community.

Additionally, Mr. Washington will not just be cut loose and left to his own devices; he will have years of supervised release awaiting him upon release. If this Court reduces Mr. Washington's sentence to time served, is also authorized to impose an equivalent term of home confinement equal to the remainder of his sentence, if it finds that appropriate. 18 U.S.C. § 3582(c)(1)(A) (court "may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment)").

Accordingly, for all these reasons, Mr. Washington respectfully submits that supervised release and/or a period of home confinement would be adequate to ensure the protection of the public.

## CONCLUSION

In sum, Mr. Washington is now serving a sentence that far exceed any sentence he would be facing today. Extraordinary and compelling reasons to reduce Mr. Washington's sentence exist here, and the § 3553(a) factors support the conclusion that a sentence reduction to credit for time served is appropriate. Accordingly, Mr. Washington respectfully moves this Court to grant his Motion and reduce his sentence in this case to credit for time served.

                                              Respectfully submitted,
                                              MITCHELL WASHINGTON

By: _____/s/_____
                 Mary E. Maguire
                 Va. Bar No. 42505

                Counsel for Defendant
Office of the Federal Public Defender
701 E Broad Street, Suite 3600
Richmond, VA 23219-1884
Ph. (804) 565-0860
Fax (804) 648-5033
Mary_Maguire@fd.org